**2018 BNH 007**         Note: This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                                                         Bk. No. 16-11181-BAH
                                                                                                   Chapter 7
Patricia D. Lombard,
        Debtor

Robert Browne,
Aqua Gulf Transport, &
JRL Properties, Inc.,
        Plaintiffs

v.                                                                                                 Adv. No. 17-1005-BAH

Patricia D. Lombard,
        Defendant

*Marc W. McDonald, Esq.*                                   *Brad C. Davis, Esq.*
*Ford & McPartlin, P.A.*                                      *Davis/Hunt Law, PLLC*
*Portsmouth, New Hampshire*                          *Franklin, New Hampshire*
*Attorney for the Plaintiffs*                                *Attorney for the Defendant*

## MEMORANDUM OPINION

### I.  INTRODUCTION

On January 25, 2018, the Court held a trial on the complaint of Robert Browne, Aqua Gulf Transport, Inc. and JRL Properties, Inc. (the "Plaintiffs").  The Plaintiffs seek to deny the discharge of the debtor, Patricia Lombard (the "Debtor"), pursuant to 11 U.S.C. § 727(a)(4)(A), on account of a number of different statements the Debtor made under oath.[1]  The Plaintiffs allege that these statements were knowingly and fraudulently false within the meaning of § 727(a)(4)(A).  At trial, the Debtor contested the Plaintiffs' standing as creditors, calling into

---

[1] Hereinafter, "§," "section," and "Bankruptcy Code" will refer to title 11 of the United States Code, unless otherwise indicated.

1

question their ability to prosecute their claims. For the reasons set forth below, the Court concludes that (1) the Plaintiffs lack standing and, alternatively, (2) their claims under § 727(a)(4)(A) are without merit.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire. This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTS

### A. Pre-Bankruptcy Events

<u>The Café Bella Sera Business and the Debtor's Connection to the Plaintiffs</u>

The Court draws much of the initial factual background from its earlier decision in <u>Browne v. Peter Lombard</u>. <u>See</u> generally <u>Browne v. Lombard (In re Lombard)</u>, 2016 BNH 005 (affirmed in <u>Browne v. Lombard (In re Lombard)</u>, No. 16-cv-139-JD (D.N.H. Aug. 12, 2016)) (hereinafter "<u>Browne I</u>"). The Debtor's husband, Peter Lombard, ran several different restaurants in Florida at least from 2008 through 2014.[2] One of these restaurants was called Café Bella Sera. The Debtor worked at Café Bella Sera as a hostess and bartender.[3] Two different corporations were established to run the restaurant and own its assets: Café Bella Sera, Inc. and Patrilom, LLC ("Patrilom").[4] The ownership structure, who had control of, and the relationship between these two entities is murky. In terms of ownership structure, Peter Lombard testified that he was the owner of all of the shares of Café Bella Sera, Inc.; he also testified that, for an undefined period of time, Patrilom was "the parent company," implying that Patrilom owned

---

[2] <u>Browne I</u> at 2.
[3] This is the extent of the Court's knowledge of the Debtor's background before 2008, aside from the fact that she is married to Peter Lombard.
[4] There is some confusion in the record over whether "Patrilom" is spelled with one or two "l"s. One "l" seems to be the correct spelling, as the name appears spelled that way in the corporate documents in the record. <u>See e.g.</u>, Ex. 18; <u>but see</u> the untitled table of contents in the Plaintiffs' exhibit binder for examples of the alternative spelling.

Café Bella Sera, Inc.[5]  Further adding to the confusion, Patrilom at times operated under the name "Pete's Café Bella Sera."  Because of this confusion, the Court refers to the restaurant business simply as "Café Bella Sera" with the understanding that the actual business was operated by Café Bella Sera, Inc. or Patrilom at various times.  The evidence regarding the practical, business purpose of having two entities operate one business was not clear.  At best, the Court can find that Patrilom at times handled the payroll for Café Bella Sera, Inc.'s employees; both the Debtor and Peter Lombard referred obliquely to this fact during their testimony.  Ancillary to this payroll function was Patrilom's ownership of a bank account, through which funds flowed to support the restaurant business.

The Debtor and her two daughters, Ashley and Haley Lombard, owned Patrilom.  This ownership makeup is borne out by the trial testimony and corporate documents.[6]  On the other hand, Peter Lombard exercised a degree of practical control over Patrilom.  For example, it was he who directed his lawyer to set up the entity, apparently based on his lawyer's tax planning advice.  He also had check-signing authority for Patrilom's checking account, and he used that authority.  There is no evidence that Patricia had any conscious involvement with the control of Patrilom aside from the fact that she occasionally signed checks on its behalf, and that Patrilom issued her a W2 showing that she earned $4,900 in 2012.[7]

In 2008, Café Bella Sera began to experience financial difficulties.  Browne, a friend of the Lombard family, and his companies—the other plaintiffs, Aqua Gulf Transport and JRL Properties—provided Peter Lombard and Café Bella Sera with over $300,000 between 2008 and

---

[5] Peter Lombard testified that the IRS took exception to this arrangement, which resulted in Patrilom giving up its ownership interest in Café Bella Sera, Inc.  There is no evidence indicating when this happened.  Trial Transcript 116: 8-16.

[6] See Exs. 16, 17, and 18, identifying either the Debtor, or the Debtor and her two daughters, as each being members and managers (denoted as "MGRM"s) of Patrilom.

[7] Ex. 15, Peter Lombard and the Debtor's joint, individual federal income tax return for 2012.  Form W2 is an attachment to the individual return.

3

2011 to help the ailing business.[8] It is unclear whether these funds were a gift to Peter Lombard and Café Bella Sera, or whether the Plaintiffs had intended them to be a loan from the start.[9] Sometime in 2012, after Browne contemplated negative tax implications of treating the transfers as gifts, he began to seek repayment from Peter Lombard and Café Bella Sera.[10] There is no evidence in the record that connects these transfers to the Debtor in her individual capacity.[11]

At some point in late 2013 or early 2014, the Debtor ceased working for Café Bella Sera and moved from Florida to New Hampshire to start a restaurant business of her own, Sub Crazy, Inc. ("Sub Crazy"). The record is devoid of any information about the decision to start this new business, whose idea it was, or when and why the decision was made. Café Bella Sera, Inc. and Patrilom provided significant amounts of money to Sub Crazy during late 2013 and early 2014, in the months leading up to the opening of Sub Crazy in May 2014. The precise amount of these transfers is not material to the outcome of this proceeding, but the total amount was more than $50,000.[12] Both the Debtor and Peter Lombard signed the checks effecting the transfers of these funds.

Of these funds intended for Sub Crazy, about $10,000 was transferred from a Café Bella Sera account directly to the Debtor's personal checking account.[13] Peter Lombard signed the withdrawal and deposit slips that transferred these funds to the Debtor's account. The Debtor did not recall these specific deposits at trial. There is no evidence about what happened with the money after it was transferred to the Debtor's account.

---

[8] Browne I at 2.
[9] Id. at 3.
[10] Id. at 3.
[11] Indeed, the only evidence in the record that explains the relationship of the Plaintiffs to the Debtor's case is available to the Court via judicial notice of Browne I.
[12] See, e.g., Ex. 10, a summary of transfers into Sub Crazy's business bank account.
[13] The $10,000 was transferred in two deposits, one on 1/2/2014 and another on 1/21/2014. Ex. 11.

4

The money did not flow just one way, from Café Bella Sera to Sub Crazy; Sub Crazy also transferred money back to Café Bella Sera to help that business with its expenses. Peter Lombard personally cashed some of the checks written on Sub Crazy's account, i.e. he went to the bank and cashed checks that either he or the Debtor had written.[14] In their testimony, both Peter Lombard and the Debtor were open about the fact that these transfers were just to help out the separate businesses.

Around this time, the Debtor asked her daughter to review Sub Crazy on the business rating service, Yelp. The review includes the sentence: "Spoke to the owner and **he** said keep your eyes open for PIZZA!"[15] The review's author again identifies the owner of the store as "he" later in the review.[16]

During the first half of 2014, Café Bella Sera ceased operating and Peter Lombard moved to New Hampshire.

**B. Post-Bankruptcy Events**

<u>Peter Lombard Bankruptcy</u>

In December 2014, Peter Lombard filed an individual chapter 7 bankruptcy petition in New Hampshire.[17] Thereafter, Browne commenced an adversary proceeding seeking to deny him a discharge.[18] After a trial, the Court found Browne's claims to be without merit.[19]

<u>Patricia Lombard Chapter 13 Case</u>

In the interim, after Peter Lombard had filed his chapter 7 petition, but before the final judgment in <u>Browne I</u>, the Debtor filed a chapter 13 petition in this Court (hereinafter the

---

[14] Trial Transcript at 122: 4-25; 123: 1.
[15] Ex. 21 (emphasis added).
[16] <u>Id.</u> at 3 ("Had the owner take a picture of the 4 foot party sub he made!").
[17] Bk. No. 14-12447-BAH.
[18] Adv. No. 15-1036-BAH, resulting in the <u>Browne I</u> decision.
[19] The claims in <u>Browne I</u> included three § 727 counts: failure to keep or preserve records, failure to explain a loss of assets, and false oath or account. See <u>Browne I</u> at 4.

5

"Chapter 13 Case").[20]  The Chapter 13 Case was pending for just over a year, from September 2015 to September 2016.  During that time Browne was an active participant.  His involvement included taking the Debtor's 2004 exam and objecting to confirmation of the Debtor's chapter 13 plan.  The Court dismissed the Chapter 13 Case before any plan was confirmed.

<u>Patricia Lombard Chapter 7 Case</u>

The Debtor filed this chapter 7 case on August 19, 2016, just a few days after Browne lost his appeal of the <u>Browne I</u> decision in the District Court and about eleven months after the dismissal of the Chapter 13 Case.  In her schedules, the Debtor listed a disputed, general unsecured claim held by "Robert Browne et. al" in the amount of $364,280.43.[21]  She listed a 100% ownership interest in Sub Crazy.[22]  She also listed both Sub Crazy and Patrilom in answering Statement of Financial Affairs (SOFA) Question 27, which inquires as to a debtor's ownership of or connection to any businesses.  The Debtor did not check any of the boxes in Question 27 indicating what her relationship to these entities was.  Additionally, she included a parenthetical description next to the description of the nature of Patrilom's business, "(Never Operated)."  The relevant sections of SOFA Question 27 are reproduced below:

27. Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?
  ☐ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time
  ☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)
  ☐ A partner in a partnership
  ☐ An officer, director, or managing executive of a corporation
  ☐ An owner of at least 5% of the voting or equity securities of a corporation

Patrilom, LLC                          Holding Company (Never
7351 No. State Road                    Operated)
Parkland, FL 33073

[23]

---

[20] Bk. No. 15-11448-JMD.
[21] Ex. 5 at 28.
[22] <u>Id.</u> at 18, Schedule A/B.
[23] <u>Id.</u> at 14.  The Joint Pretrial Statement incorrectly quotes the Debtor's answer to SOFA Question 27 as "holding company which was never activated."  Joint Pretrial Statement at 3 (AP Doc. No. 36).

6

At trial, the Debtor clarified the meaning of the parenthetical "Never Operated" and her failure to check one of the boxes indicating what kind of interest she was disclosing. The Debtor acknowledged that Patrilom did in fact operate as an entity, but clarified that she had meant she was not involved in its operations and did not know anything of significance about them.[24] The Debtor's testimony was consistent with her attorney's representation on her behalf at the 341 meeting.[25] With regard to not checking any of the boxes, the Debtor stated that she was not aware of that failure until this adversary proceeding.

The Debtor's testimony at the 341 meeting of creditors is also relevant to the Plaintiffs' claims in this proceeding. There, in response to a question by the Plaintiffs' counsel, the Debtor indicated that she did not know what 'Patrilom' was. At trial, the Debtor explained that this claimed lack of knowledge was due to a mispronunciation on the part of Plaintiffs' counsel and the pressures of the situation itself.[26] At the 341 meeting, Plaintiffs' counsel immediately directed the Debtor's attention to her bankruptcy schedules, which—as previously discussed—included references to Patrilom.[27] After being shown her schedules at the 341 meeting, the Debtor was able to discuss Patrilom and indicated she understood what Plaintiffs' counsel was referring to. The Debtor's testimony at trial was essentially consistent with her testimony at the 341 meeting.

After conducting the 341 meeting of creditors, the chapter 7 trustee filed a no asset report. Consequently, no deadline to file proofs of claim was established in this case. Nevertheless, the Plaintiffs each filed a proof of claim.[28] Browne filed a proof of claim in the

---

[24] Trial Transcript at 28: 7-15.
[25] Id. At trial, the Court sustained an objection to the Debtor testifying about what her attorney had said at the 341 meeting. Ex. 20 was, however, admitted by agreement and contains the attorney's comments. Ex. 20 at 30: 1-15.
[26] Phonetically, Plaintiffs' counsel placed the emphasis on the middle syllable, whereas the Debtor and Peter Lombard placed the emphasis on the first syllable.
[27] Ex. 20 at 28: 16-23; 29.
[28] The parties did not introduce these proofs of claim as evidence, but the Court may take judicial notice of their existence in the Claims Register.

7

amount of $207,000; JRL Properties, Inc. one in the amount of $145,000; and Aqua Gulf Transport, Inc. a claim in the amount of $11,780.  Aside from the official form, each proof contains an identical attachment—an almost entirely illegible spreadsheet that includes no apparent reference to the Debtor individually.[29]

The Adversary Proceedings: Browne II and the Current Adversary Proceeding

The Plaintiffs filed this adversary proceeding on January 20, 2017, after various extensions of time to file complaints pursuant to §§ 523 and 727. Additionally, after an adverse ruling on appeal in Browne I, Browne commenced a second proceeding against Peter Lombard, again seeking to deny his discharge.  See Browne v. Lombard, Adv. No. 17-1004-BAH (hereinafter "Browne II").[30]  Browne II was commenced on the same day as the current proceeding—Adv. No. 17-1005-BAH—and the legal issues are very similar to those in the current proceeding, but the parties did not move to consolidate the cases.

In its original form, the adversary complaint in this proceeding contained two counts. The Court dismissed Count II—the § 523 count—after a protracted fight over whether the Plaintiffs had properly stated a claim.  See Browne v. Lombard (In re Lombard), 2017 BNH 015.[31]

During the pretrial phase of this proceeding, the Plaintiffs' theory of the case regarding Count I shifted significantly, but without any commensurate amendment of the allegations contained in that count.  The version of Count I of the complaint that was effective as of the time of the trial appears at AP Doc. No. 22 ("Amended Complaint").[32]  The parties elaborated their

---

[29] The spreadsheet is titled "Pete Lombard and Café Bella Serra Outstanding Loans as of 2/8/2013."
[30] Concurrently with this opinion, the Court is releasing a memorandum opinion in Browne II disposing of that adversary proceeding.
[31] The Court deferred entering a final judgment resolving Count II until the rest of this adversary proceeding was also resolved.
[32] Hereinafter, "AP Doc. No." refers to docket entries in the adversary proceeding Adv. No. 17-1005.

understanding of the bounds of Count I in a joint pretrial statement[33] and a supplement, filed at the Court's request.[34] Between the filing of the initial complaint and the supplement to the final pretrial statement, the Plaintiffs dropped their § 727(a)(4)(A) allegations that were premised on allegedly false oaths the Debtor made during her Chapter 13 Case and during a deposition taken in connection with Peter Lombard's pending chapter 7 case.[35] Up until the time of the supplement to the final pretrial statement, these allegations had explicitly been the primary basis of Count I.[36] Additionally, in the supplement to the joint pretrial statement, the Plaintiffs indicated—for the first time—their intent to proceed on a new theory, namely that the Debtor had failed to disclose certain prepetition income in her bankruptcy schedules.[37] This late addition did not draw an objection from the Debtor prior to trial.

    The Court held a trial on the merits of the § 727(a)(4)(A) count on January 11, 2018. In another late development, the Debtor—for the first time, and during her opening statement—contested the Plaintiffs' standing as creditors, calling into question their ability to maintain their claims. The Plaintiffs offered no evidence to support their standing beyond the Debtor's reference to "Robert Browne et. al." in her Schedule E/F,[38] and their own proofs of claim. On the other hand the Debtor's unrebutted testimony was that she had never received any money from the Plaintiffs.[39] Two witnesses testified, the Debtor and Peter Lombard. At the conclusion of the trial, the parties filed post-trial briefs and the Court took the matter under advisement.

---

[33] AP Doc. No. 36.
[34] AP Doc. No. 42. At the final pretrial hearing, the Court requested a supplement to the Joint Pretrial Statement given confusion over the false oaths the Plaintiffs were intent on proving at trial.
[35] See Supplement to Joint Pretrial Statement, AP Doc. No. 42 at ¶ 13.
[36] See Amended Complaint, AP Doc. No. 22, Ex. B at ¶¶ 13-18; Joint Pretrial Statement, AP Doc. No. 36 at 2.
[37] See Supplement to joint pretrial statement at ¶ 9.
[38] See Exs. 4 and 5. The Plaintiffs also point to a set of requests for admissions allegedly propounded on the Debtor in connection with prepetition litigation, which requested a response about a debt owed to the Plaintiffs. Ex. 19. However, the Plaintiffs were not able to offer any evidence that the Debtor had seen or responded to these requests for admissions; no answers appear in Ex. 19 and the Debtor was not able to recall having seen the document before.
[39] Trial Transcript, 83: 2-10. The Court initially sustained an objection to this testimony, but reversed its ruling. See Trial Transcript, 84: 1-24; 104: 24-25; 105: 1-3.

9

### C. Positions of the Parties

As to standing, the Plaintiffs' argument begins and ends with the Debtor's schedules and their proofs of claim. They note that the Debtor scheduled them as the holder of a disputed, unsecured claim in the amount of $364,280.43, and that they filed proofs of claim in this case. They conclude that their inclusion in the schedules and their filing of proofs of claim makes them at least the holders of disputed claims against the estate, and therefore "creditors" who can bring a § 727(a) claim, based on the definitions of creditor and claim in the Bankruptcy Code.

The Plaintiffs advance a number of theories as to why the Debtor should lose her discharge. First, they argue the $10,000 worth of deposits that Café Bella Sera, Inc. made into the Debtor's personal bank account should have been disclosed as income in answer to SOFA Question 5. Second, they claim that the Debtor's answers to SOFA Question 27 were knowingly false in two respects: the failure to check a box to indicate what her relationship to Patrilom was and her inclusion of the parenthetical statement that Patrilom "never operated" when it did actually operate. Third, they argue that the Debtor made a knowing and fraudulently false statement when she claimed to not know what Patrilom was at her 341 meeting. Finally, the Plaintiffs argue that the Debtor's failure to disclose what they claim is Peter Lombard's "hidden beneficial interest" in Sub Crazy, evidenced by his acting like an owner in taking money out of the business, from which they conclude that the Debtor is merely a straw owner. They also point to the use of the masculine pronoun "he" to refer to the owner of Sub Crazy in the Yelp review to support this theory of the case.

The Debtor challenges the Plaintiffs' standing, arguing that despite being scheduled as creditors with a disputed claim, and having filed proofs of claim, the record demonstrates that the Plaintiffs actually have no claim against her. In response to the Plaintiffs' claim about the unscheduled $10,000 in deposits, the Debtor argues that this claim was not pleaded in the

complaint, but, even if it is considered, there was no material misstatement because Peter Lombard, not the Debtor, made the deposits and she was unaware of them until this proceeding. The Debtor claims that the Plaintiffs have not proven that the $10,000 in deposits amounted to gross income that should have been included in her SOFA.

Finally, the Debtor argues that no knowingly false statement was made regarding SOFA Question 27 because her failure to check a box in answering it was clearly inadvertent; her ownership interest in Patrilom was disclosed on Schedule B, and her intention in saying "never operated" was to disclose that she never operated the company, not that it never operated at all.

### III. DISCUSSION

The Court will first address whether the Plaintiffs have standing to maintain their § 727(a)(4)(A) claim and then move on to address the claim itself.

### A. Standing: 11 U.S.C. § 727(c)

The Court must resolve questions of standing whenever raised, even when they first occur at trial. Warchol v. Barry (In re Barry), 451 B.R. 654, 660 (B.A.P. 1st Cir. 2011) ("The First Circuit has stated unequivocally that 'a defect in standing cannot be waived; it must be raised, either by the parties or by the court, whenever it becomes apparent.'") (quoting U.S. v. AVX Corp., 962 F.2d 108, 116 n.7 (1st Cir. 1992)). In the current context, the Plaintiffs' standing is governed by § 727(c), which requires the Plaintiffs to be creditors in order to maintain their discharge-denial claim.[40] Creditors are those entities with prepetition claims,[41] and claims are defined in § 101(5):

---

[40] "The trustee, a creditor, or the United States trustee may object to the granting of a discharge under subsection (a) of this section." 11 U.S.C. § 727(c)(1).
[41] "The term 'creditor' means—
    (A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[.]" 11 U.S.C. § 101(10)(A).

> The term "claim" means—
> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.[42]

There is no evidence in the record in this case that explains what debt the Plaintiffs think the Debtor personally owes them. At trial, Plaintiffs' counsel was unable even to argue what the basis of the debt was beyond referring to requests for admissions from prepetition litigation, to which—he argued—the Debtor had failed to respond and so should be deemed admitted.[43] The Plaintiffs had, however, no evidence at trial to support this argument, beyond the requests for admissions themselves. In the absence of any evidence demonstrating that the Plaintiffs have a right to payment from the Debtor, in conjunction with the Debtor's testimony that neither Browne nor his companies ever loaned her any money, the Court finds that the Plaintiffs do not hold claims and are not prepetition creditors of the Debtor. They do not have standing to maintain their § 727(a)(4)(A) claims against the Debtor in this proceeding.

The Plaintiffs cite cases that support the proposition that even a disputed claim may provide a creditor with standing. See e.g., Lussier v. Sullivan (In re Sullivan), 455 B.R. 829 (B.A.P. 1st Cir. 2011). This argument misses the mark entirely. The issue is not whether a disputed claim provides a creditor with standing but whether the Plaintiffs have facially valid claims at all. The Court finds the Plaintiffs without standing because their claims are unsupported on their face and because the Plaintiffs themselves were not able to articulate any basis for the claims at trial. The fact that the Debtor scheduled a claim of "Robert Browne et

---

[42] 11 U.S.C. § 101(5).
[43] Ex. 19. Question 2 refers to a sum of money allegedly lent to all the defendants named in that litigation, one of whom is the Debtor. See also Trial Transcript 107: 19-25; 108: 1-25; 109: 1-22.

al."—if the Court assumes that "et al." encompasses the other Plaintiffs—simply means that the Debtor was aware that the Plaintiffs were seeking to recover a specific sum from her. It does not provide any basis for the Court to find that the Plaintiffs in fact have a right to payment.

If the world worked as the Plaintiffs argue it should, then the Court would be prevented from examining the validity of a putative creditor's standing during a § 727(a) adversary proceeding, so long as the creditor was scheduled as the holder of a claim or had filed a proof of claim—even where, as here, creditors were requested on the chapter 7 341 meeting notice[44] not to file a proof of claim. Any party could simply file a baseless proof of claim and then obtain the benefits of creditor standing. Given Congress' inclusion of an explicit standing requirement in § 727(c), this cannot be the rule. In order to maintain a cause of action under § 727(a), a party must actually be a creditor of the debtor, rather than just a party with a patently baseless claim. See e.g., Barry, 451 B.R. at 660 (finding that a creditor with a claim against the debtor was unable to articulate any basis for a claim against his joint-debtor spouse and thus had no standing to pursue a § 727(a) objection against her).

### B. Objection to Discharge 11 U.S.C. § 727(a)(4)(A)

Even if the Court were to assume that the Plaintiffs had standing, their § 727 claims have no merit. Section 727(a)(4)(A) provides that a debtor will not receive a discharge if "the debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account." § 727(a)(4)(A). "The elements that must be proved to avoid discharge under this provision are (1) the debtor knowingly and fraudulently made a false oath, and (2) the false oath related to a material fact in connection to the bankruptcy case." Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 68 (1st Cir. 2004) (citing Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987)). "A debtor 'knowingly and fraudulently' makes a false oath if the debtor 'knows the truth

---

[44] Bk. Doc. No. 4.

and nonetheless willfully and intentionally swears to what is false.'" Hannon v. ABCD Holdings, LLC (In re Hannon), 839 F.3d 63, 72 (1st Cir. 2016) (quoting Sullivan, 455 B.R. at 837). "A false oath is material if its subject matter 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" Premier Capital LLC v. Crawford (In re Crawford), 841 F.3d 1, 8 (1st Cir. 2016) (quoting Tully, 818 F.2d at 111). "A debtor's discharge should not be denied under § 727(a)(4)(A) if the false statement or omission is the result of mistake or inadvertence . . . or if the mistake is technical and not real." Mei Yan Zhou v. Wen Jing Huang (In re Wen Jing Huang), 544 B.R. 256, 263 (Bankr. D. Mass 2016) (quoting Gordon v. Mukerjee (In re Mukerjee), 98 B.R. 627, 629 (Bankr. D.N.H.1989)) (internal quotation marks omitted). The burden of proof is on the objecting creditor by a preponderance of the evidence. Harrington v. Donahue (In re Donahue), BAP No. NH 11-026, 2011 WL 6737074, at *11 (B.A.P. 1st Cir. Dec. 20, 2011).

First, the Court will address the issue of the Debtor's failure to disclose the $10,000 that Peter Lombard deposited into her personal checking account at the beginning of 2014. The Plaintiffs argue that the Debtor's failure to disclose these deposits amounts to a false oath for which the Debtor's discharge should be denied. The Defendant argues that this issue was not raised in the Amended Complaint, and that even if the issue is properly before the Court, the evidence is insufficient to show that the deposits are income that the Debtor was required to disclose in her bankruptcy schedules.

As the Court recounted above in the fact section, it is clear that the Plaintiffs make no mention of a failure to disclose income in the Amended Complaint. This $10,000 of missing income issue appears for the first time in the supplement to the joint pretrial statement. At that time, however, the Debtor made no objection to the Plaintiffs raising the issue. Federal Rule of

14

Bankruptcy Procedure 7015, applying Federal Rule of Civil Procedure 15(b), "permits the consideration of unpleaded claims 'by express or implied consent' of the parties."[45] Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1172 (1st Cir. 1995) (internal quotation makes omitted); Fustolo v. The Patriot Group LLC (In re Fustolo), 896 F.3d 76 (1st Cir. 2018).  Here, the Debtor expressly consented to the trial of this issue in paragraph 9 of the supplement to the joint pretrial statement:

> 9.  Plaintiff alleges that the Defendant answering "no" to Question No. 5 of the SOFA, "Did you receive other income during this year or the two previous calendar years" constitutes false oath because it failed to account for at least the following:  A withdrawal from the checking account of Partillom, LLC which was deposited into Defendant's personal account (No. 4824) in the amount of $21,800.00 which occurred on April 9, 2014.  Also two withdrawals from the checking account of Café Bella Sera, Inc. in January of 2014, one being in the amount of $6,250.00 and one in the amount of $4,350.00 were deposited into Patricia's personal account (No. 4824).  These deposits into her personal account should have been disclosed as "other income."

The Debtor, through counsel, expressly agreed to the trial of this issue by signing the supplement to the joint pretrial statement.  Accordingly, the Court concludes that the issue is properly before it now.

On the merits, the Plaintiffs have failed to build a record sufficient to persuade the Court, by a preponderance of the evidence, that the cumulative $10,000 deposits were gross income that the Debtor knowingly and fraudulently failed to disclose in her answer to SOFA Question 5.  The only evidence in the record on this point is the deposit slips themselves—pages 2 and 3 of

---

[45] "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue."  Fed. R. Civ. P. 15(b)(2).

Ex. 11—and the Debtor's testimony regarding the deposits.  The Debtor testified that she did not remember or recognize the specific deposits themselves, which occurred nearly two years before the petition date.  There was no evidence regarding what happened with the money after it was deposited into the Debtor's account or why the money was transferred from Café Bella Sera's account to the Debtor's personal account.  There was general testimony from Peter Lombard that he was transferring money to Sub Crazy and the Debtor to help start the Sub Crazy business, but that testimony did not specifically address the $10,000 worth of deposits included in Exhibit 11.  On this record, the Court finds it more plausible that the funds were meant for Sub Crazy and passed through the Debtor; it is unclear that they even became the Debtor's property.  And, even if the deposits were income to the Debtor, there is insufficient evidence for the Court to conclude that the Debtor's failure to include this income in her bankruptcy schedules was anything other than an unwitting omission.  The Plaintiffs have not met their burden to prove by a preponderance of the evidence that the $10,000 worth of deposits were part of the Debtor's gross income that should have been disclosed in her SOFA, let alone that the Debtor's failure to disclose them was knowing and fraudulent.

     Next, the Court will address the Plaintiffs claims regarding the treatment of the Debtor's role at Patrilom in her SOFA.  The Plaintiffs first argue that the Debtor falsely and fraudulently indicated that Patrilom "never operated" and second that she knowingly and fraudulently did not check the appropriate box to indicate what her relationship to Patrilom was.  First, with regard to the "never operated" parenthetical statement, the Court finds the evidence ambiguous.  The Debtor indicates she meant that *she* never operated the LLC, not that the LLC never operated in the abstract.  The evidence is consistent with the Debtor's characterization.  The Debtor appeared generally unfamiliar with Patrilom's purpose and function, although she did appear to be aware that she was an owner of the LLC.  As best as the Court can determine, far from being a

knowingly false and fraudulent oath, the "never operated" was the Debtor's attempt to communicate this ambiguity in her schedules. As to the failure to check any of the boxes, there is no evidence that this was anything other than a mistake, which is not grounds for denial of a discharge. Indeed, the disclosure of Patrilom in the SOFA makes it unclear what the Debtor would have been hiding; her failure to check a box is actually consistent with the Debtor's professed lack of knowledge about her specific role with regard to Patrilom.

The Plaintiffs' penultimate argument is that the Debtor knowingly and fraudulently misrepresented her role regarding Patrilom during her 341 meeting when she told Plaintiffs' counsel that she did not know what Patrilom was. After reviewing the transcript of the 341 meeting and hearing the Debtor's testimony about the meeting, the Court concludes that the statement was entirely immaterial because it was immediately clarified after it was made, during the same line of questioning.

Finally, the Court must address the Plaintiffs' argument that the Debtor failed to disclose Peter Lombard's hidden beneficial interest in Sub Crazy, and the other side of this coin: that the Debtor is its straw owner. In the supplement to the final pretrial statement, the Plaintiffs represented that the Debtor made a false statement at her 341 meeting that Peter Lombard was not an owner of Sub Crazy. This portion of the 341 transcript is not in the record in this case. The Plaintiff never pointed to any other instance of a false oath relating to this topic.

The Plaintiffs spent a significant amount of time trying to establish that Peter Lombard was the *de facto* owner of Sub Crazy. Yet, the Plaintiffs never provided any legal argument to back up their contention that Peter Lombard was a secret owner of Sub Crazy. The documentary evidence presented at trial consistently shows that Patricia Lombard was the legal owner of Sub Crazy. The filings with the New Hampshire Secretary of State are consistent in that representation, as are the Debtor's schedules. At best, there is evidence that Peter Lombard

17

exercised a modicum of control over Sub Crazy's bank account. But, it is entirely unclear how pervasive that control was. The Plaintiffs were quick to identify the checks Peter Lombard had written on Sub Crazy's accounts, but provided no evidence of how prevalent such transactions were when compared to all of the checks that Sub Crazy wrote in the ordinary course. The Court entirely discounts the Yelp review—circumstantial evidence about the gender of Sub Crazy's owner does not tip the scales in the Plaintiffs' favor, especially when the review's author did not testify.

Another fundamental problem with the "hidden beneficial interest" claim is that the Plaintiffs did not establish that Peter Lombard held that interest prior to the Debtor's bankruptcy filing. If, for example, the Plaintiffs had pursued and obtained a judgment prepetition declaring that Peter Lombard had a beneficial interest in Sub Crazy, then the Debtor would have been required to disclose such an interest in her bankruptcy schedules. However, there is no such judgment. In effect, the Plaintiffs are asking the Court to find—based on some unarticulated legal principle—that Peter Lombard is an equitable owner of Sub Crazy and then hold the Debtor retroactively responsible for having failed to schedule that interest on her bankruptcy petition when it was filed. Such an argument is entirely without merit.

Additionally, the Court finds that the evidence does not support the Plaintiffs' theory that the Debtor was a mere straw owner of the Sub Crazy business. There is virtually no evidence about whose idea it was to start the business or any of the decision making process that lead to the business's creation. Neither the Debtor nor Peter Lombard were asked any questions on this topic. The only relevant question the Debtor was asked is whether she had any prior experience running a restaurant. Simply taking the fact that the Debtor had never run a restaurant before Sub Crazy and putting it beside the fact that Peter Lombard has extensive experience running restaurants is insufficient to demonstrate by a preponderance of the evidence that the Debtor was

a straw owner of the business.  The Plaintiffs have not established an evidentiary foundation for this theory.

Finally, justice demands that the Court generally address the merits of this litigation, having now considered each of the Plaintiffs' claims individually.  After months of litigation and much pretrial posturing, the Plaintiffs presented a meritless case against the Debtor.  At trial they could not articulate what debt the Debtor owed them[46] and presented evidence untethered from any legal argument.[47]  Proceedings to deny a debtor's discharge should not be the result of amassing every technical misstatement or error a debtor has made during the bankruptcy case, taking them out of context, and using them as ammunition to deny a deserving debtor a fresh start.  The Court has difficulty seeing this case as much more than that.

## IV.  CONCLUSION

For the reasons outlined above, the Court finds the Plaintiffs lack standing to bring a complaint objecting to the Debtor's discharge.  Alternatively, the Plaintiffs have failed to establish that the Court should deny the Debtor's discharge pursuant to § 727(a)(4)(A).  Accordingly, the Court will deny the relief requested in the Amended Complaint.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate judgment consistent with this opinion.

ENTERED at Concord, New Hampshire.

Date:  August 31, 2018          /s/ Bruce A. Harwood
                                Bruce A. Harwood
                                Chief Bankruptcy Judge

---

[46] See standing discussion supra.
[47] See discussion regarding the ownership of Sub Crazy supra.